UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ROBIN SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CASE NO. 1:06-cv-0986-DFH-DML |
| LISA G. NEATHERY, WILLIAM | ) |
| PROVINCE, M.D., individually and | ) |
| d/b/a WILLIAM D. PROVINCE, | ) |
| M.D. INC., | ) |
| | ) |
| Defendants. | ) |

ENTRY ON MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Robin Smith broke her ankle in a car accident in April 2004 and had surgery to repair it with screws.  She was arrested in Johnson County in May 2004 and placed in jail.  While in jail, her cast was removed but her ankle later showed clear signs of infection at the site of the surgery.  Defendant Lisa Neathery was a nurse at the jail who inspected Smith's injured leg.  She forwarded her findings to defendant Dr. William Province.  Dr. Province prescribed an oral antibiotic.  The antibiotic was clearly ineffective.  No other medical treatment was given beyond changing bandages.  A few weeks later, Smith's infection had become so serious that her foot and a portion of her leg were amputated.

Smith filed suit in Johnson Superior Court alleging a variety of torts, including claims under 42 U.S.C. § 1983 alleging a violation of her rights under

the Eighth Amendment.  Technically, as a pre-trial detainee, Smith asserts her claim under the due process clause of the Fourteenth Amendment, but the standards are effectively identical.  See *Whiting v. Marathon County Sheriff's Department*, 382 F.3d 700, 703 (7th Cir. 2004); *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003) ("The eighth amendment does not apply to pretrial detainees, but as a pretrial detainee, [plaintiff] was entitled to at least the same protection against deliberate indifference to his basic needs as is available to convicted prisoners under the Eighth Amendment."); *Washington v. LaPorte County Sheriff's Department*, 306 F.3d 515, 517 (7th Cir. 2002) (same).  The case was properly removed to this court pursuant to 28 U.S.C. § 1441.[1]

Neathery filed a motion for summary judgment on the § 1983 claims, and Dr. Province joined the motion.  Plaintiff Smith responded separately to each individual defendant, and each defendant filed an individual reply.  As explained below, Smith has presented genuine issues of fact about whether both defendants' care or lack of care amounted to deliberate indifference to her serious medical need, and defendants are not entitled to qualified immunity.  Summary judgment

---

[1]The original state court complaint included state law tort claims against Dr. Province, Neathery, the Johnson County Board of Commissioners, the Johnson County Sheriff's Department, the Johnson County Sheriff individually, and the jail commander individually.  Smith also asserted a negligence claim against her private treating physician, Dr. Reynolds.  She filed an amended complaint on January 17, 2008.  That complaint dropped the Board of Commissioners and Dr. Reynolds as defendants and added negligence claims against Dr. Province and Neathery.  The claims against the Sheriff's Department, the jail commander, and the Johnson County Sheriff have been dismissed by stipulation.  Dr. Province is sued both individually and doing business as William D.  Province, M.D., Inc.

is denied on the § 1983 claims against both defendants.  The motion did not address the medical malpractice claims.

*Standard for Summary Judgment*

Summary judgment must be granted if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law.  *Id.*  The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party.  *Id.* at 249.

When ruling on the motion, the court must view all the evidence in the record in the light most favorable to the non-moving party and must resolve all factual disputes in the non-moving party's favor.  See *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).  The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law."
*Anderson*, 477 U.S. at 251-52.

### Facts For Summary Judgment

The following statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Smith, the non-moving party. See *Reeves,* 530 U.S. at 150. Defendants submitted a total of one and a half pages of relevant facts in their original brief.[2] Plaintiff's statement of facts is much lengthier, but many of the citations are to the complaint. The complaint is not verified, so Smith cannot use it as evidence. Cf. *Ford v. Wilson*, 90 F.3d 245, 246-47 (7th Cir. 1996) (reversing summary judgment for defendant where plaintiff had relied on a verified complaint as evidentiary support because unlike an ordinary complaint, a verified complaint "converted the complaint . . . into an affidavit"). With these caveats, this court has done its best to sort out the facts and factual disputes shown by the record.

Smith was in an automobile accident on April 10, 2004 and fractured her wrist and right ankle. The ankle required surgery that included use of surgical

---

[2]Nearly half of that is devoted to a discussion of Smith's apparent history of prescription drug abuse and her requests for various pills. Those matters have minimal relevance on summary judgment. Defendants make no effort in their argument to excuse their actions or inaction based on a concern about Smith's past drug use.

screws to join broken bones together.  On May 9, 2004, Smith was arrested and placed in the Johnson County Jail for altering a prescription.  When she entered the jail, she still had a cast on her leg.  On May 17, 2004, she was taken from the jail to an appointment with her orthopedic surgeon, Dr. Reynolds, who removed the cast.  Smith Dep. 59-60.  She was accompanied by jail personnel who were instructed regarding appropriate medical care for the injury, including the need to keep the leg elevated and cleaned.

Throughout the relevant time period, Neathery was a licensed practical nurse working at the jail.  Dr. Province was the jail's doctor.  Neathery was responsible for changing Smith's bandages each day.  She first noted signs of infection on Tuesday, May 25, 2004.  At that time, Neathery noted "several spots that are leaking, and area is warm to touch."  Neathery Dep. 148.  Based on that information, Neathery knew that the leg was probably infected.  Neathery Dep. 149.  Neathery wrote her findings in Smith's record.  That day, Dr. Province prescribed an oral antibiotic, Keflex.  Province Dep. 91-92.  He did not examine Smith that day, and he took no further action to oversee her care.

It is disputed how often Smith received the Keflex.  She admitted in her deposition testimony to receiving three or four pills.  Smith Dep. 142-43.  The medical records are not necessarily reliable.  Much later, Neathery filled in the chart to show administration of Keflex, including for days that she did not work.  Neathery Dep. 211-15.  Neathery did not know who was at the jail on her days off

or who gave Smith her medication on those days.  Neathery Dep. 215.  In her June 4th Medical Request Form, Smith did not list Keflex or any medication in the section where the inmate should mark her current medication.  Neathery believes that Smith stopped receiving Keflex on June 1st based on a prescription for seven days of pills.  Neathery Dep. 181.

Despite the prescription, Smith's leg continued to deteriorate.  The jail medical record includes no statement on the status of Smith's leg between May 25th and June 4th.  On June 1st, Neathery called Dr. Reynolds' office.  She told his staff that Smith was non-weightbearing, crying, and could not walk on her foot.  Neathery Dep. 168-69.  Neathery asked Dr. Reynolds' staff to see plaintiff sooner than her scheduled appointment on June 28th.  Neathery Dep. 177. Neathery did not tell Dr. Reynolds' staff that the wound was leaking or warm. Neathery Dep. 176.  Neathery's telephone call did not result in a change of the appointment.  Neathery did not tell Dr. Reynolds' staff that Smith needed to be seen immediately, merely "sooner than her original appointment."  Neathery Dep. 178.  Neathery did not report this information to Dr. Province.

On Friday, June 4, 2004, Smith completed an "Inmate Medical Request Form" that referenced "Lisa the nurse," presumably Neathery.  The form calls for a "general description of illness."  Smith wrote:  "Look at my leg.  It don't look good."  Smith wrote that Neathery had scheduled an appointment with Dr.

Reynolds, "but it needs to bee[sic] soon I think."  Dkt. No. 82, Ex. B.[3]  Neathery

looked at Smith's ankle.  She believed both that it should have been healed by

that date and that the infection was ongoing.  Neathery Dep. 186.  However,

Neathery called it only a "small wound" on the outer *left* ankle and merely applied

an antibiotic ointment and a bandage.[4]  She did not contact Dr. Province that day

but noted that a follow-up appointment had already been made with Dr. Reynolds.

Dkt. No. 82, Ex. B.  She did not state the date of the appointment nor did she say

that she had failed to report the infection symptoms to Dr. Reynolds.  Dr. Province

saw the report several days later, probably on Tuesday, June 8th, but merely

initialed it and took no further action.  Province Dep. 108-10.

Smith's leg continued to deteriorate.  Smith filled out another Inmate

Medical Request Form on June 10, 2004.  That form stated:  "I need treatment for

my leg it has infection in it also fever and it hurts really bad and also I can't

sleep."  Dkt. No. 82, Ex. B.  Another nurse saw Smith and referred her for

immediate care.  Smith was admitted to a local hospital that day with a serious

_____

[3]Smith notes that Neathery "said she had a appointment for me to see Dr. Reynolds," but it is unclear if that means anything besides the originally scheduled appointment on June 28, 2004.  Neathery testified in her deposition that Smith's follow-up was scheduled for June 28th, so no change was apparently made after Smith's condition took a turn for the worse.  Neathery is unsure when she scheduled the follow-up appointment.  Neathery Dep. 143.

[4]Smith's actual injury was on her right leg.  She never received any treatment on any left leg injury.  The court assumes for now that the note was clearly a mistake and was intended to refer to the right leg.  Based on the mistake, Dr. Province attempts to suggest that Smith's right ankle was fine on June 4th, two weeks before the amputation.  See Dr. Province Reply Br. 2.  He is welcome to make that argument to the jury.

infection of the bones in her lower leg and ankle.  She underwent three surgeries there.  Those surgeries proved unsuccessful.  Smith was transferred to Wishard Hospital in Indianapolis, where her leg was surgically amputated below the knee on June 18, 2004.  Smith Dep. 93-94.  Additional facts are noted below, keeping in mind the standard that applies on summary judgment.

*Plaintiff's Experts*

Plaintiff submits two expert reports for purposes of the pending motions for summary judgment.  Dr. Kendall Wagner, a board certified orthopedic surgeon, testified that the reported symptoms on May 25, 2004 were clear evidence of a possible infection at the site of the orthopedic surgery.    Under those circumstances, he wrote, "it is inconceivable that Dr. Province would not physically examine Ms. Smith . . . or that he would not schedule a physical follow-up with her to check her progress . . ."  Wagner Aff. ¶ 6.  Dr. Wagner also testified that Neathery's failure to report the deterioration of the leg on June 4, 2004 "further contributed to the worsening of Ms. Smith's condition."  Wagner Aff. ¶ 8. Dr. Wagner concluded that Smith should have been sent for emergency treatment on May 25, 2004 and that:  "It is my opinion within a reasonable degree of medical certainty that the failure to provide adequate, timely medical treatment by the medical staff at Johnson County Jail caused the loss of Ms. Smith's right leg." Wagner Aff. ¶ 12.

Plaintiff's other expert is her treating physician, Dr. Rena Stewart, an orthopedic trauma surgeon then at Wishard Hospital and the Indiana University School of Medicine who eventually performed the amputation.   Dr. Stewart testified that Smith's leg was infected as early as May 25, 2004 and that Smith should have been sent for emergency treatment at that time.   Stewart Dep. 137-38.  Dr. Stewart testified that the use of the oral antibiotic Keflex was "inadequate and not proper treatment for that presentation of infection."  Stewart Dep. 141-42. The key difference, according to Dr. Stewart, is that an infection overlying a recent orthopedic operation is not appropriate for Keflex because of the risk that the bones and hardware may be infected.   Stewart testified that if Smith had been referred to a medical doctor on May 25, 2004, she would have had up to an 80 percent chance of avoiding amputation.   Stewart Dep. 139-40.   Additional facts are noted below, keeping in mind the standard for summary judgment.

*Discussion*

The motions for summary judgment do not address Smith's claims for medical malpractice.  The motions deal exclusively with her claims under § 1983 that Neathery and Dr. Province violated her constitutional rights by being deliberately indifferent to her serious medical need while she was in jail.  This area of law is well-settled, and the parties do not disagree on the applicable law.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  For purposes of this motion, neither defendant disputes that they were acting "under color of state law."  The relevant inquiry is whether Smith has come forward with sufficient evidence that would allow a reasonable jury to find that the defendants violated a constitutional right.

The right at issue, since Smith was a pretrial detainee, is her right to due process under the Fourteenth Amendment.  *Bell v. Wolfish*, 441 U.S. 520, 535, n.16 (1979) ("Due process requires that a pretrial detainee not be punished.").  The standard applied in analyzing alleged deprivations of that right is analogous and effectively identical to the standard used under the Eighth Amendment's cruel and unusual punishment standard for basic needs, including medical care, after conviction for a crime.  *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003).  The Supreme Court has long made it clear that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotations omitted).

The Eighth Amendment inquiry has both subjective and objective elements.  A prison official does not act with deliberate indifference unless he "knows of and disregards an excessive risk to inmate health or safety; the official must both be

aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). To show deliberate indifference, a prison official must act "recklessly," which means the person "must consciously disregard a substantial risk of serious harm." *Farmer*, 511 U.S. at 839 (internal quotations omitted). A plaintiff does not need to prove that a defendant intended harm or that he actually believed harm would result. It is enough to show that the defendant "*actually knew* of a substantial *risk*." *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996).

For purposes of the motions for summary judgment, the court must assume that plaintiff could prove professional negligence by Dr. Province, Nurse Neathery, or both. That proof of negligence is not necessarily sufficient, however, to prove *deliberate* indifference, which is required to prove a constitutional violation:

> an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle*, 429 U.S. at 105-06; accord, *Estate of Cole v. Fromm*, 94 F.3d 254, 259 (7th Cir. 1996).

In considering Smith's claim and defendants' motion for summary judgment, it is important to remember that "deliberate indifference normally can be proved only with circumstantial evidence." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008).  The plaintiff need not use direct evidence that defendants knew the seriousness of Smith's condition, as "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

For purposes of summary judgment, Smith clearly has shown that she had a serious medical need.  By Tuesday, May 25th, she had an infection at the site of her orthopedic surgery to repair her broken ankle with hardware.  The risk of infection of the bone itself was serious and immediate.  See Stewart Dep. 160. Plaintiff's experts, Dr. Wagner and Dr. Stewart, both testified that the condition called for immediate attention that day.  Stewart Dep. 113, 126, 137-38; Wagner Aff. ¶ 6.

For purposes of summary judgment, Smith has also shown that both Neathery and Dr. Province subjectively knew of her serious medical need. Neathery and Dr. Province both knew of Smith's orthopedic surgery which was listed on her chart.  Neathery Dep. 148-51.[5]  Both testified that they recognized

---

[5]The summary judgment record does not include a copy of the May 25, 2004 medical chart entry, but Neathery's testimony about the document is sufficient for present purposes to support a finding that Dr. Province, who saw the entry, was also aware of the orthopedic surgery.  Also, Dr. Province had actually seen Smith
(continued...)

the signs of infection.  Neathery Dep. 149; Province Dep. 98.  The issue, then, becomes whether a jury could reasonably infer deliberate indifference from the circumstantial evidence of Nurse Neathery's and Dr. Province's states of mind.

I.     *Defendant Neathery*

Based on Neathery's repeated contact with Smith's severely infected leg and her failure to take the necessary steps to get Smith the help she needed, and viewing the evidence through the summary judgment lens, "a reasonable trier of fact *could* conclude" that Neathery was subjectively aware of Smith's "serious medical condition and either knowingly or recklessly disregarded it."  *Hayes*, 546 F.3d at 524.  The evidence shows that Neathery actually recognized Smith's serious medical need.  Neathery made her first notation about a possible infection after examining Smith's leg on May 25, 2004.  Neathery had sufficient training and experience to know the signs of an infection.  Neathery Dep. 34-35, 36, 39, 40.  She admits that she knew the wound was most likely infected on this date. Neathery Dep. 149.  At that time, Neathery personally did nothing to treat the wound or to confirm her suspicions.  She alerted Dr. Province to the symptoms, and he prescribed Keflex, an oral antibiotic.

---

[5](...continued)
on May 11, 2004 because a pin that had been inserted in her injured wrist was coming out, so he would have seen her cast and known of the ankle surgery then. See Province Dep. 73-75.

If that were the extent of Nurse Neathery's involvement, her efforts to divert responsibility to others might be more persuasive. But Neathery continued to be responsible for changing the dressings on Smith's leg. Neathery contends that she monitored Smith's wound on her working days from May 25th through June 4th. Yet, the jail has no record of Smith's worsening condition. Neathery Dep. 165-66. On June 1, 2004, Neathery took the affirmative step of contacting Smith's orthopedic surgeon, Dr. Reynolds, to request an appointment before the next scheduled appointment on June 28, 2004. Neathery made no record of the contact, but Dr. Reynolds' office has a written note that Neathery said that Smith was non-weightbearing, crying, and could not walk on her foot. See Neathery Dep. 169. But Neathery did not tell Dr. Reynolds' staff of the leakage and warmth that clearly signaled an infection. The appointment remained scheduled for June 28th.

Apart from this telephone call to Smith's orthopedic surgeon's office, Neathery took no affirmative actions after May 25th to have Smith's worsening infection treated properly. On June 4th, Smith herself submitted a request that her appointment with her physician be scheduled sooner, noting that her foot did not "look good." Neathery inspected the foot, concluded that Smith was still suffering from an ongoing infection, and decided to treat the wound with only an antibiotic ointment and a bandage. At that time, Neathery did not contact Dr. Province or Dr. Reynolds. She did not record an assessment of the infected wound, and her note even referred to the wrong leg. Dkt. No. 82, Ex. B. She

merely forwarded a note to Dr. Province stating that a follow-up appointment was scheduled with Smith's orthopedic surgeon.  She did not tell Dr. Province the wound was still infected, and her note did not state that the appointment was not until June 28th, twenty-four days later.

Construing these facts in a way most favorable to Smith, a reasonable jury could find that Neathery exhibited deliberate indifference.  Neathery's subjective knowledge of the injury is not disputed.  She repeatedly saw Smith's leg.  The jury could easily find that the infection and symptoms were getting worse and worse.  As an experienced nurse, Neathery knew the serious risks that infection can pose, including not just amputation but also death.  Neathery Dep. 43-44.

Neathery defends her actions by pointing out that she is only a nurse and that she notified doctors of Smith's condition.  On May 25, 2004, she sent a note to Dr. Province that led to the prescription of Keflex.  She contacted Smith's treating physician on June 1st, and she passed a note to Dr. Province on June 4th.  Neathery emphasizes that as a licensed practical nurse, she was not an expert in infections.  She argues it was reasonable for her to rely on two independent doctors to recommend a continued course of treatment:  "As a licensed practical nurse, she can only report the condition of the patient to the treating physician(s) and carry out any orders that they may provide."  Neathery Reply Br. 6.

This argument has some force and may persuade a jury.  The problems with this argument on this motion are that Neathery reported only *some* of her findings and that her responsibilities are not so narrow.[6]  A licensed practical nurse is not merely a stenographer.  Neathery is a medical professional who, if Smith is to be believed, witnessed the continuing deterioration, after surgery, of a clearly infected leg over a period of nearly two weeks.  Smith was prescribed Keflex, but the drug was clearly ineffective.  A jury could easily find that Neathery actually knew it was ineffective.  Neathery, despite repeated viewing of the deteriorating leg, only once called the outside orthopedic surgeon and reported only some symptoms to someone in that office.  Neathery never specifically told Dr. Province that the Keflex he had prescribed did not cure the infection.  Nor did he bother to ask.

Neathery's defense based on Dr. Province's prescription of Keflex is not sufficient because Neathery continued to see the leg deteriorate between May 25th and June 4th.  She made no notations in Smith's chart about the condition of the leg, which Dr. Province could access.  Neathery Dep. 166.  The only other affirmative step she took was contacting Smith's outside orthopedic surgeon.  It is unclear who Neathery spoke to at that office, but the simple fact that a person in that office – listening on the telephone to Neathery's incomplete description of symptoms – decided not to move an already scheduled appointment nearly four

_____

[6]It is unclear how many times Neathery inspected Smith's leg.  Before Friday, June 4th, Neathery made only one notation in the medical record, on May 25th.  Smith completed a cycle of antibiotics on June 1st.  While Neathery called Dr. Reynolds, she did not note in Smith's medical files at the jail that the infection was lingering and that Smith was in a great deal of pain.

weeks away does not clear Neathery of all responsibility for Smith's care.  A post-surgical infection is not difficult to diagnose, and Neathery herself recognized the infection and the risks.

Neathery cites several court decisions in which courts found as a matter of law that medical professionals did not act with deliberate indifference.  These cases are readily distinguishable in terms of the medical professionals' responses to serious medical needs.  In *Walker v. Peters*, 233 F.3d 494 (7th Cir. 2000), the plaintiff had a long list of health problems, including hemophilia and HIV.  While in prison, he received no treatment for HIV for years.  In that case, however, the plaintiff had refused to take a blood test proving that he was HIV positive.  The vast majority of hemophiliacs who underwent treatments that the plaintiff went through during the 1980s did in fact have the HIV infection.  Still, the plaintiff refused the confirmatory test.  In upholding summary judgment for defendants, the Seventh Circuit concluded:  "requiring an HIV test before dispensing a dangerous drug used to treat HIV positive persons and persons with AIDS is so clearly within the realm of reasonable conduct by the prison that no reasonable jury could find that the prison was deliberately indifferent to Walker's serious medical needs for requiring that test, even though he had many of the symptoms of the disease."  *Id.* at 500.  Here, Smith refused no offer of medical testing or treatment.  Neathery recognized the continuing infection.  She should not have needed more cues or tests to insist on emergency treatment well before the other nurse took that step on June 10th, when it was too late to save Smith's leg.

In *Tatlock v. Isaac*, 2008 WL 4757332 (N.D. Ind. October 30, 2008), the court granted defendants' motion to dismiss because negligence alone was not sufficient to state a claim under § 1983.  The case was completely different.  The plaintiff was treated by a nurse twice for a swollen leg.  The first time she gave him ibuprofen.  The second time she consulted a doctor and had him rest.  The plaintiff ended up having blood clots in his legs.  The brief opinion makes no mention of open and obvious symptoms, only that the plaintiff sought treatment.  In this case, Smith's leg was clearly infected and deteriorating despite the initial treatment.  While the medical professionals arguably could have done more for Tatlock, a jury could not find that they deliberately ignored an obvious risk.  In Smith's case, however, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

In *Allen v. Frank*, 2006 WL 1876971 (E.D. Wis. July 3, 2006), *aff'd*, 246 Fed. Appx. 388 (7th Cir. 2007), the plaintiff had testicular pain.  The medical professionals could not figure out the source of his pain, and the plaintiff hoped for additional testing that was not provided.  On summary judgment, the district court decided that the case presented only a disagreement about treatment but noted that a different result could be reached "if the plaintiff presented with an obvious medical problem such as a broken bone and the physician gave him antibiotics and nothing else."  *Allen*, 2006 WL 1876971, at *4.  Here, Smith's

injury was open and obvious to any medical staff as a post-surgical wound that was undoubtedly infected.  Smith received at most only clean bandages and one week's worth of an ineffective oral antibiotic.

The Seventh Circuit on appeal in *Allen* found that, "the prison medical staff performed countless examinations and ordered multiple tests but Allen has identified nothing of concern in the results that should have called for treatment other than the use of Ciproflaxen to combat the possibility of infection."  *Allen v. Frank*, 246 Fed. Appx. at 391.  Here no tests were ordered, and Smith was not taken to a doctor for treatment until June 10th, sixteen days after the prescription of the ineffective Keflex, and nine days after the last pill was to have been dispensed.

Several other pieces of evidence could support a reasonable jury's inference that Neathery acted with deliberate indifference.  First, Neathery failed to implement Dr. Reynolds' order that Smith keep her leg elevated.  At her May 17th appointment with Dr. Reynolds, Smith was accompanied by a guard who filed a report with Neathery.  That report included Dr. Reynolds' order to keep the leg elevated.  Neathery never took any affirmative steps to see that this plan was implemented.  Neathery Dep. 140-43.  Second, the administration of Keflex is disputed, and it is not clear that Smith even received the prescribed dosage.  Third, Neathery's telephone report to Dr. Reynolds' staff did not include a description of the sores and oozing taking place, nor did she say the wound was

warm – all clear signs of infection at the surgical site.  As a result of Neathery's failure to provide that information, that office may not have had all the information needed to determine the seriousness of the condition.  Finally, Neathery's June 4th note to Dr. Province stated that an appointment was scheduled with Dr. Reynolds but did not state that it was still more than three weeks away.  Nor did the note indicate clearly how serious Smith's infection had become.

In light of all these facts, a jury would not be required to absolve Nurse Neathery of responsibility under the deliberate indifference standard.   A reasonable jury could find that Neathery saw Smith's deteriorating leg on a regular basis and did not take the necessary steps to get her the prompt treatment she needed.  On June 4th, Smith's condition had continued to deteriorate, three days after Neathery told Dr. Reynolds' office that the pain was so severe it made Smith cry. In response to this clearly infected leg, Neathery merely applied antibiotic ointment and a bandage.  At that point, Smith had received (or at least had been prescribed) a full course of antibiotics, and her condition was still getting worse. Neathery's note did not reach Dr. Province for several days, a fact that Neathery could be assumed to have understood.  Smith's next scheduled appointment with Dr. Reynolds was still weeks away.  These facts could allow a reasonable jury to find that Neathery's responses to Smith's serious medical need "were so plainly inappropriate as to permit the inference" that Neathery intentionally or recklessly

disregarded Smith's serious medical needs.  *Hayes*, 546 F.3d at 524 (reversing summary judgment in favor of prison doctor).

II.     *Dr. Province*

The applicable legal standard remains the same, but Dr. Province presents a factual situation very different from Neathery.  Unlike Neathery, who saw the leg on a repeated basis but failed to take sufficient steps to see that it was treated, Dr. Province never actually laid eyes on Smith's infected leg.  Upon receiving a report about the leg on May 25, 2004, Dr. Province prescribed the oral antibiotic Keflex for seven days.  From that point forward, a jury could find, he did nothing else on behalf of Smith despite having access to a report of the continuing infection.  A reasonable jury could find his lack of attention to Smith's suffering to be deliberate indifference.

In light of the case law, Dr. Province understandably tries to frame the issue as nothing more than a disagreement on treatment.  The treatment was the prescription of Keflex on May 25th.  Dr. Province's conduct on that date, standing alone, might not be sufficient to find deliberate indifference.  (The court expresses no definitive view on that question, especially in light of plaintiff's expert witnesses, who testified that Dr. Province knew enough on that date to see that the infection presented a genuine emergency.)  The fact that Dr. Province made that initial inadequate effort to treat Smith, however, does not control the issue

of deliberate indifference.  In *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005), the Seventh Circuit reversed in part a grant of summary judgment where the medical providers refused to change the course of treatment despite plaintiff's "repeated reports that the medication was not working and his condition was getting worse."  Greeno presented with vomiting and severe heartburn as early as December 1994.  The symptoms became progressively worse until he was finally treated in 1997 for an esophageal ulcer.  Greeno received some treatment, mainly Maalox and a prescription for Tagamet.   When he complained that those medicines were ineffective, the medical professionals added ibuprofen and Tylenol for the pain.  After repeated requests for a bland diet and some success with a short-term prescription for Prilosec, Greeno finally saw a gastrointestinal specialist who performed an endoscopy and diagnosed an ulcer and prescribed Prilosec.  The Seventh Circuit emphasized that dismissing the case because Greeno "received *some* treatment overlooks the possibility that the treatment [plaintiff] did receive was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition."  *Id.*, quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996).  Smith was not as persistent as the plaintiff in *Greeno*, but her condition was both much more serious, eventually resulting in amputation, and much more obvious, a clearly infected surgical wound.

Dr. Province's responsibility did not stop with his writing the prescription on May 25th.  Between May 25 and June 10, when Smith was finally sent to the

hospital, it became abundantly clear to any medical professional who examined Smith that Keflex was not solving the infection. Dr. Province's failure to take any action after issuing the prescription could allow a reasonable jury to find deliberate indifference. On June 8th, Dr. Province read the June 4th note from Neathery about Smith's current condition, indicating that the leg was still infected. Ten days after he prescribed seven days of an oral antibiotic, he still took no action.

Dr. Province argues that he failed to take action because he thought that Dr. Reynolds was dealing with Smith's infection. The note from Neathery stated: "Dr. Reynolds already made aware of this." Dkt. No. 82, Ex. B. Dr. Province argues that since Smith's orthopedic surgeon had been notified, he did not need to take any additional steps. The decision to rely on a brief note that Dr. Reynolds had been notified is not, as Dr. Province would claim, a "deliberate decision by a doctor to treat a medical need in a particular manner." Dr. Province Reply Br. at 8. The decision Dr. Province made was not to treat Smith's injury at all and to *assume* that someone else, who did not have access to a patient in the jail, was treating her.

The argument has some superficial appeal, but it overlooks the details of the calendar. Dr. Province learned that Smith's surgical wound was infected on Tuesday, May 25th. He prescribed the Keflex *and took no further action*. He did not even see Neathery's note about Dr. Reynolds until two critical weeks later, on

Tuesday June 8th.  Even if Dr. Province could have relied on Dr. Reynolds after he read Neathery's note on June 8th, he could not have done so during those two critical weeks while the infection spread through Smith's bones.

Based on the evidence in the record, perhaps a jury might still find that Dr. Province's actions were merely negligent or even that he did not violate an applicable standard of care.[7]  Since this is Dr. Province's motion for summary judgment, however, this court must view the evidence in a light most favorable to Smith.  Under that lens, Dr. Province prescribed a drug and then completely ignored a patient with a serious and urgent medical need as the prescription failed to address that need.

Plaintiff has come forward with expert testimony that would allow a reasonable jury to find that Dr. Province's actions after the prescription of Keflex showed deliberate indifference.[8]  Dr. Wagner testified that "it is inconceivable" that

_____

[7]Consistent with this view, Dr. Province submits the results of a review by an Indiana Department of Insurance medical review panel, which unanimously determined that the evidence before it did not support the conclusion that he failed to meet the applicable standard of care.  Dkt. No. 97, Ex. 2.  This evidence is instructive but not decisive, and it is countered by Smith's experts' much more detailed reports.  On a motion for summary judgment, this court must give Smith the benefit of the conflict in the evidence.

[8]Dr. Stewart testified that the infected surgical wound needed emergency treatment on May 25th.  Stewart Dep. 137-38.  The court does not decide now whether Dr. Province's decision on May 25th to prescribe Keflex without examining Smith would, by itself, support an inference of deliberate indifference.  But the prescription followed by a complete lack of attention to see if it was effective could support a finding of deliberate indifference.

Dr. Province did not choose to physically examine Smith upon hearing of her infection, and that: "The lack of concern shown for this patient is incredible." Wagner Aff. ¶ 6. A reasonable jury could find that Dr. Province received a report of a woman with a post-surgical leg infection, prescribed a drug, and then completely forgot about her. When he saw a note two weeks later that her condition had deteriorated despite the prescription, he continued to ignore her. He merely assumed, but did not confirm, that another doctor who did not have access to see Smith was taking care of her serious medical needs. Smith had no ability to leave the jail and to seek medical care on her own. Dr. Province did not check to see when the appointment was scheduled or examine Smith personally to make sure that she was receiving appropriate treatment. Instead, he relied on Neathery and the other nurses for treatment. Smith's chart stated the date of her scheduled appointment with Dr. Reynolds, so Dr. Province had access to that information if he cared to look for it. Neathery Dep. 187. A reasonable jury could determine that this course of conduct shows that Dr. Province was deliberately indifferent to Smith's serious medical need because he "failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842.

III.    *Qualified Immunity*

Qualified immunity is a defense that protects state actors from individual liability for constitutional violations unless their actions were unconstitutional under clearly established law. *Miller v. Jones*, 444 F.3d 929, 934 (7th Cir. 2006),

citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "The purpose of qualified immunity is to shield public officers from liability where 'a change in the law or . . . enduring legal uncertainty . . . makes it difficult for the officer to assess the lawfulness of the act in question *before* he does it.'"  *Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007), quoting *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999).  "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, — U.S. —, — , 129 S. Ct. 808, 815 (2009).

A government official is not entitled to qualified immunity for individual liability where the facts a plaintiff alleges (1) reveal a constitutional violation (2) according to "clearly established" law at the time.  *Anderson v. Creighton*, 483 U.S. at 639-40; *Marshall v. Teske*, 284 F.3d 765, 772 (7th Cir. 2002).  The relevant law is "clearly established" where (1) the violation is so obvious that a reasonable officer would know that his actions violated the Constitution, or (2) a closely analogous case establishes that the conduct is unconstitutional.  *Siebert v. Severino*, 256 F.3d 648, 654-55 (7th Cir. 2001); *Brokaw v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000) ("a plaintiff need not always identify a closely analogous case" to show that a violation is "clearly established").

The first step in the qualified immunity analysis is determining whether defendants violated Smith's constitutional rights.   See *Norfleet v. Webster*, 439 F.3d 392 (7th Cir. 2006) (reversing denial of summary judgment on qualified immunity appeal based on a finding of no constitutional violation).   As stated above, Smith has provided sufficient evidence to allow a reasonable jury to find that her constitutional right had been violated.   The remaining question is whether the right was clearly established.   At its broadest level, the case law on medical treatment of prisoners is abundant and the principles are well-known. "It has been established for decades that prison physicians violate inmates' constitutional rights when they deliberately disregard an inmate's serious medical condition."   *Hayes v. Snyder*, 546 F.3d 516, 528 (7th Cir. 2008)(reversing summary judgment in favor of jail doctor).   The status of a licensed practical nurse is comparable.   The question remains, however, whether it was clearly established that Neathery and Dr. Province's conduct violated Smith's constitutional rights, so that a reasonable nurse or doctor in their situation would have recognized that his or her actions and inaction would violate those rights.

Two Seventh Circuit decisions featuring similar factual situations help mark what is and what is not constitutionally deficient medical care.   In the first, *Sherrod v. Lingle*, 223 F.3d 605 (7th Cir. 2000), the plaintiff had shown obvious (and recognized) signs of appendicitis for nearly two weeks before the appendix ruptured and he needed emergency surgery, leading to a finding of a violation of his Eighth Amendment rights.   The second, *Williams v. O'Leary*, 55 F.3d 320 (7th

Cir. 1995), involved a bone infection.  The Seventh Circuit granted qualified immunity because while the medical care was negligent, it had not been clearly established that repeated negligent medical care rose to the level of a constitutional violation.  In both cases, the plaintiffs, like Smith, presented a serious medical need that was not initially treated properly.  The difference between the two cases lies in the quantity and quality of steps taking by medical professionals to treat the problems.

In *Sherrod*, the plaintiff had serious pain in his abdomen.  He was given an enema and pain medication and was kept under observation.  Eight days later, plaintiff was sent to a hospital where gall bladder and upper gastrointestinal tests were performed.  The results of the tests were negative.  Two weeks after he first complained about the symptoms of appendicitis, the plaintiffs' blood pressure dropped and he was "stooped over in intense pain," leading to another trip to the hospital.  There, an emergency surgery was done for a ruptured appendix and a gangrenous bowel.  One of Sherrod's nurses later admitted that she knew that he had been suffering from appendicitis.

In *Williams*, the plaintiff was diagnosed in 1988 with a chronic condition known as osteomyelitis, a bone infection that causes inflammation of the bone marrow and adjacent bone.  He was being treated with an antibiotic that was ineffective, so he was sent to a hospital for intravenous antibiotic treatment.  In the hospital, the medical professionals thought they had diagnosed the cause of

his osteomyelitis, so they recommended a new drug, Ciprofloxacin, that was never administered.  Williams was examined by a staff physician 24 times in 1989 and 15 times in 1990.  Multiple doctors erred by failing to determine the underlying cause of his infection.  After a mistrial, the district judge granted judgment for the relevant defendants on qualified immunity grounds.  The Seventh Circuit found that Williams "was given antibiotics which were deemed effective against a staph infection, the most common cause of osteomyelitis."  *Williams*, 55 F.3d at 324.  Because the actions were at most only repeated negligent mistakes, the court found that they did not support an inference of deliberate indifference.

The minimal treatment and attention that Smith received for her infected surgical wound are much closer to the facts in *Sherrod* than to those in *Williams*.  In fact, Sherrod received more care, and the Seventh Circuit still reversed summary judgment on deliberate indifference.  Like Sherrod, Smith was given an initial treatment and then mostly ignored.  (Sherrod, at least, benefitted from additional testing; Smith received nothing of the sort.)  Furthermore, like Sherrod's nurse who realized he had appendicitis, Neathery knew that Smith's surgical wound was infected.  In *Sherrod*, the district court erred in part because it focused too much on Sherrod's symptoms when he first brought them to the attention of medical staff and overlooked the events as his condition worsened: "Because Sherrod's condition worsened in the ensuing days, the requisite excessive risk to his health may have [arisen] and been disregarded sometime between March 10 and March 24, when he finally received appropriate treatment

for his condition." 223 F.3d at 611. In Smith's case, we have not only the ineffective prescription of Keflex on May 25th but also the fact that nothing else was done in the next two weeks as the infection spread and any chance of saving Smith's leg was lost.

The treatment for the bone infection in *Williams* was much more thorough than anything Smith experienced in the jail. While Smith never saw a doctor, Williams did dozens of times over a period of two years. When the first round of antibiotics was ineffective, the doctors were paying attention and recognized that the treatment was not effective. Williams was not left simply to deal with his pain but was instead hospitalized for intravenous antibiotic treatment. If Dr. Province had repeatedly viewed Smith's leg and had simply chosen the wrong treatment, then it might have been clear that the case involved at most only medical malpractice not rising to the level of deliberate indifference. But Smith did not receive nearly the amount of care and attention that Williams did. Also, since Williams' poor treatment went on for a matter of years, it is apparent that his condition was less serious than the infection that cost Smith her leg in a matter of weeks.

A reasonable jury could find here that the conduct of Neathery and Dr. Province, viewed in the light most favorably to Smith, rose to the level of deliberate indifference. In this case, a reasonable jury could find that after the May 25th prescription of Keflex, neither Neathery nor Dr. Province did anything to treat

Smith's severely infected leg until it was too late to save the leg.  Throughout that time, Smith had no access to her own doctor.  She could depend on only the medical staff at the jail to provide the appropriate treatment for her infection.  On this record, a reasonable jury could find that Neathery and/or Dr. Province acted in a manner that violated clearly established constitutional law.

*Motion to Exclude Blacklock's Testimony*

Neathery has moved to exclude the testimony of one of Smith's proposed experts, Ronald Blacklock, because Smith did not comply with Rule 26(a)(2) of the Federal Rules of Civil Procedure.  Rule 26(a)(2) requires the disclosure of any potential expert witness and the filing of an expert report.  Rule 37 provides that if a party fails to meet the disclosure requirements under Rule 26(a), "the party is not allowed to use that information or witness . . . unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

In this case, the failure to disclose is harmless.  The case management plan set the expert disclosure deadline for December 10, 2008.  Smith claims that she provided a copy of Blacklock's report by the deadline.  Neathery disputes this, and Smith provides no evidence that the report was delivered.  All parties agree that Smith provided all relevant information, including Blacklock's curriculum vitae, by March 13, 2009.

In determining whether a Rule 26(a) failure is harmless, a district court should consider "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).  In this case, all factors point toward the failure being harmless.  The trial is not scheduled until August 10, 2009.  Defendants received all the relevant materials almost five months before the scheduled trial date.  They will not be surprised or unable to prepare for Blacklock's testimony, and the trial will not be disrupted.  Neathery does not indicate any bad faith by Smith other than the fact that the disclosure was late.

To ensure that the delay was harmless, defendants may schedule a deposition of Blacklock and may identify their own rebuttal expert(s) if they wish to do so.  Plaintiff shall ensure that Blacklock is available for a deposition at the reasonable convenience of defense counsel, and defendants may identify any rebuttal expert and serve any expert report no later than July 31, 2009.  The motion to exclude Blacklock's testimony is denied, subject to plaintiff making him available for a deposition if the defense seeks one.

*Conclusion*

For the foregoing reasons, defendants' motion for summary judgment (Dkt. No. 81), and Neathery's motion to exclude expert testimony (Dkt. No. 109) are denied.


So ordered.

Date: July 2, 2009

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Robert M. Giroux, JR.
FIEGER FIEGER KENNEY & JOHNSON
r.giroux@figerlaw.com

Thomas A. Manges
ROBY HOOD & MANGES
tmanges@robymanges.com

Calvert S. Miller
MILLER MURPHY & MILLER LLP
csm@millermurphylaw.com

Jason Andrew Scheele
MILLER MURPHY & MILLER LLP
jas@millermurphylaw.com

Michael A. Barranda
MILLER MURPHY & MILLER LLP
mab@millermurphylaw.com

James Walter Brauer
STEWART & IRWIN P.C.
jbrauer@silegal.com

Michele L. Henderson
STEWART & IRWIN P.C.
mhenderson@silegal.com